UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

AMEERA MOHAMED ABDU SALEH, ZAKARIA   :
SULTAN NAJI ALSHAIF, ABDULMOTALEB SULTAN :
NAJI ALSHAIF, ASRAR SULTAN NAJI ALSHAIF,   :
ABRAR SULTAN NAJI ALSHAIF, IBRAHIM SULTAN :
NAJI ALSHAIF, and LINA SULTAN NAJI ALSHAIF,  :

        :

                 Plaintiffs,   :

        :

         -v-        :

        :

REX TILLERSON[1] and UNITED STATES   :
DEPARTMENT OF STATE,   :

        :

                Defendants.   :

        :

------------------------------------------------------------------X

16 Civ. 10025 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Ameera Mohamed Abdu Saleh ("Saleh") and her children—Zakaria Sultan Naji Alshaif,

Abdulmotaleb Sultan Naji Alshaif, Asrar Sultan Naji Alshaif, Abrar Sultan Naji Alshaif, Ibrahim

Sultan Naji Alshaif, and Lina Sultan Naji Alshaif (together, "the Alshaifs" and, with Saleh,

"petitioners")[2]—have petitioned this Court for a writ of mandamus to compel the U.S. State

Department and officials therein (collectively, "the Government") to issue Saleh an immigrant

visa. The Alshaifs claim that the Government's refusal of their mother's immigrant visa violates

their right to liberty under the Fifth Amendment's Due Process Clause. Because the doctrine of

consular non-reviewability bars review, the Court dismisses the petition.

---

[1] Rex Tillerson became Secretary of the Department of State on February 1, 2017. Pursuant to
Fed. R. Civ. P. 25(d), Secretary Tillerson is substituted for his predecessor, John F. Kerry, as a
defendant in this action. The Clerk is directed to amend the caption to reflect this change.

[2] Saleh's son Zakaria Sultan Naji Alshaif was identified as a petitioner on the initial petition but
is not named as such on the Amended Petition, the operative pleading before the Court.

1

## I.  Background[3]

Saleh is a Yemeni citizen and homemaker. *See* Am. Pet. ¶ 30. In 2006, Saleh's husband, Sultan Naji Alshaif, a U.S. Citizen, submitted a Form I-130 petition to the State Department, seeking a visa on behalf of Saleh. *Id.* ¶ 14.[4] After Saleh's husband's death, the I-130 petition was approved and transferred to the National Visa Center, where it was assigned the case number SAA2006762013. *Id.* ¶¶ 15–16.

In November 2015, Saleh—having fled the civil war in Yemen for Djibouti—was interviewed by U.S. officials at the U.S. Embassy in Djibouti. *Id.* ¶ 18. At that interview, Saleh received a notice from an Embassy official stating that her "immigrant visa [was] approved," and that the Embassy would "now prepare your visa and immigration packet." *Id.* ¶ 20. Saleh did not, however, receive a visa and immigration packet. *Id.* ¶ 21. Rather, Saleh's visa application

---

[3] The Court derives the facts that follow from the First Amended Petition for a Writ of Mandamus ("Am. Pet."). The Court accepts as true all factual allegations in that petition, drawing all reasonable inferences in petitioners' favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). Similarly, where, as here, the Rule 12(b)(1) motion is "facial"—that is, "based solely on the allegations of the complaint or the complaint and exhibits attached to it," *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016)—the Court may consider the documents incorporated by reference within the complaint, *see Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694 n.3 (S.D.N.Y. 2009) (Chin, *J.*). Here, the Government's Rule 12(b)(1) motion argues that the consular response denying Saleh a visa is unreviewable, whereas the Amended Petition claims that that response, as reflected in the Refusal Worksheet, was made in bad faith and was an act of retaliation. The Court therefore treats as cognizable on the Government's motion the "Refusal Worksheet" attached as an exhibit to the Declaration of Brandon Waterman. Dkt. 29. The Court has also considered the parties' supplemental letter briefs, Dkts. 36 and 40, and the exhibits attached thereto.

[4] An I-130 petition provides a mechanism by which a U.S. citizen may have an alien relative classified as an immediate relative by the U.S. Customs and Immigration Service. 8 U.S.C. § 1154(a)(1); *see id.* § 1151(b)(2)(A)(i) (defining immediate relatives). Once so classified, the alien may then apply for an immigration visa. *See id.* §§ 1201(a)(1), 1202(a).

was listed as being in "administrative processing" on the website of the Consular Electronic Application Center. *Id.* As of late December 2016, Saleh had still not received her visa. *See id.* ¶¶ 23–26.

On December 28, 2016, Saleh and the Alshaifs filed the initial petition for a writ of mandamus in this case. *Id.* ¶ 26; *see* Dkt. 1 ("Pet."). The petition sought to compel the State Department to issue Saleh her immigration visa and to issue one of Saleh's sons, Zakaria Alshaif, his U.S. passport. Pet. ¶¶ 29–30, 55, 67.

On April 26, 2017, while this lawsuit was pending, Saleh's counsel received a copy of a "Refusal Worksheet," on which an official in the U.S. Embassy in Djibouti indicated that Saleh's immigration visa had been rejected under Section 212(a)(3)(B) of the Immigration and Nationality Act ("INA"). Am. Pet. ¶ 27; *see* Dkt. 29, Declaration of Brandon M. Waterman, Ex. 1 ("Refusal Worksheet").

On April 27, 2017, after extensions of the Government's deadline to respond, *see* Dkts. 13–16, the Government submitted a letter asking the Court to dismiss the petition as moot, on the ground that Zakaria Alshaif had received his U.S. passport and that Saleh's application for an immigration visa had been denied in a final decision by U.S. embassy personnel in Djibouti. *See* Dkt. 17. The Government attached the Refusal Worksheet, dated April 26, 2017, in which the Government had informed Saleh that her visa application had been denied. *See* Refusal Worksheet. Section 212(a)(3)(B), codified at 8 U.S.C. § 1182(a)(3)(B), provides that an alien is ineligible for a visa if he or she has engaged in any of several terrorism-related activities. The Refusal Worksheet does not explain why the consular official believed Saleh was so ineligible.

On May 5, 2017, in response to the Court's order, Dkt. 18, petitioners filed a response, seeking leave to file an amended petition to challenge the Government's denial of Saleh's visa

application, Dkt. 19. On May 10, 2017, the Court issued an order directing the Government to file a formal motion to dismiss and setting a briefing schedule for that motion. Dkt. 21. On May 22, 2017, the parties filed a joint stipulation, providing that the Government would forgo filing a motion to dismiss and that petitioners instead would file an amended petition. Dkt. 22.

On June 5, 2017, petitioners filed their First Amended Petition. Dkt. 23. It abandoned the challenges to the Government's failure to issue a passport to Zakaria Alshaif, challenging only the refusal of Saleh's immigrant visa application. On July 10, 2017, the Government filed a motion to dismiss, Dkt. 26, as well as a memorandum of law, Dkt. 27 ("Gov't Br.") and declarations in support, Dkts. 28–29. The Government seeks dismissal of the Amended Petition for lack of jurisdiction, under Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim, under Rule 12(b)(6). *See* Gov't Br. at 9–10. On July 28, 2017, petitioners filed a brief in opposition, Dkt. 31, and on August 4, 2017, the Government submitted its reply, Dkt. 32.

On January 23, 2018, this Court commissioned supplemental briefing as to two questions related to the doctrine of consular non-reviewability. Dkt. 33. After seeking and receiving extensions, on February 7, 2018 the Government submitted its brief, Dkt. 36 ("Gov't Supp. Br."), and on February 16, 2018, the petitioners submitted theirs, Dkt. 40 ("Pet. Supp. Br."). The Court thanks counsel for their prompt and helpful submissions.

## II. Legal Standards

### A. Rule 12(b)(1)

A claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "Pursuant to Rule 12(b)(1), dismissal for lack of subject matter jurisdiction is appropriate if the Court determines that it lacks the constitutional

or statutory power to adjudicate the case." *Lleshi v. Kerry*, 127 F. Supp. 3d 196, 199 (S.D.N.Y. 2015); *see Makarova*, 201 F.3d at 113.

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists." *Giammatteo v. Newton*, 452 Fed. App'x. 24, 27 (2d Cir. 2011) (citing *Makarova*, 201 F.3d at 113). In resolving a motion to dismiss for lack of subject matter jurisdiction, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Natural Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (internal quotation omitted), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998); *see also APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003); *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). On such a motion, a court may consider evidence outside the pleadings, such as affidavits and exhibits. *See Makarova*, 201 F.3d at 113.

### B.  Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A

pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Discussion

### A. The Doctrine of Consular Non-Reviewability

The Government argues that this Court must dismiss this action—whether for lack of jurisdiction or for failure to state a claim—under the doctrine of consular non-reviewability. That doctrine reflects the principle "that a consular officer's decision to deny a visa is immune from judicial review."[5] *Am. Acad. of Religion v. Napolitano,* 573 F.3d 115, 123 (2d Cir. 2009). Although "much could be said for the view, were we writing on a clean slate, that the Due Process Clause qualifies the scope of political discretion heretofore recognized as belonging to Congress in regulating the entry and deportation of aliens," *Galvan v. Press*, 347 U.S. 522, 530–31 (1954) (Frankfurter, *J.*), this Court—like the Supreme Court, which has repeatedly declined to reconsider this doctrine—does not write on a clean slate. *See id.*; *see also, e.g., Kleindienst v. Mandel*, 408 U.S. 753, 767 (1972) (discussing the historical practice and noting, "[w]e are not inclined in the present context to reconsider this line of cases"). The Supreme Court instead has repeatedly held that, "[t]he power of [C]ongress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and

---

[5] Whether the doctrine of consular non-reviewability is jurisdictional is unsettled in this Circuit. *See Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 123 (2d Cir. 2009) (declining to label this doctrine "jurisdictional," while stating that the doctrine may "mean[] that the generally available federal question jurisdiction provided by section 1331 to adjudicate First Amendment claims is withdrawn where the claim is based on a consular officer's denial of a visa," or that it may mean "that prudential considerations, perhaps arising from separation of powers concerns, counsel against exercising normally available jurisdiction."). *But see U.S. ex rel. London v. Phelps*, 22 F.2d 288, 290 (2d Cir. 1927) ("Whether the consul has acted reasonably or unreasonably is not for us to determine. Unjustifiable refusal to visa a passport may be ground for diplomatic complaint by the nation whose subject has been discriminated against . . . It is beyond the jurisdiction of the court."); *Lleshi*, 127 F. Supp. 3d at 201 (dismissing for lack of jurisdiction under Rule 12(b)(1) a petition challenging the denial of an alien's visa).

6

to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications." *Mandel*, 408 U.S. at 766 (quoting *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895)). It follows that a court presented with a petition challenging the decision of a consular officer "does not have jurisdiction to review a consular official's decision, even if its foundation was erroneous, arbitrary, or contrary to agency regulations." *Ngassam v. Chertoff*, 590 F. Supp. 2d 461, 466–67 (S.D.N.Y. 2008); *see Mandel*, 408 U.S. at 765–67.

This broad prohibition on judicial review, however, is subject to an exception: Courts have jurisdiction to review consular decisions where challenged by U.S. citizens who assert constitutional, rather than statutory, claims. *Am. Acad. of Religion*, 573 F.3d at 125; *see Mandel*, 408 U.S. at 770; *Kerry v. Din*, 135 S. Ct. 2128, 2140 (2015) (Kennedy, *J.*, concurring in the judgment). But that exception itself is limited. On a citizen's constitutional challenge to a consular decision, a court may ask only whether the Government has provided a "facially legitimate and bona fide reason" for its decision; a court may neither "look behind the exercise of that discretion, nor test it by balancing its justification against the [constitutional] interests of those who seek" review of a consular determination. *Mandel*, 408 U.S. at 770; *see Am. Acad. of Religion*, 573 F.3d at 125; *Lleshi*, 127 F. Supp. 3d at 199–200. Where the consular official has provided a facially legitimate and bona fide reason for his or her decision, a court's inquiry is at its end.

## B. Discussion

### 1. Impact of *Kerry v. Din*

Before applying these settled principles, the Court pauses to assess the Supreme Court's decision in *Kerry v. Din*, 135 S. Ct. 2128 (2015). *Din* involved a mandamus petition by a U.S. citizen challenging, as a violation of due process, the denial of her non-citizen spouse's visa

7

application.  In *Din*, the Court, ruling for the Government, vacated a Ninth Circuit decision that had reversed a district court decision denying the mandamus petition.  A majority of five Justices agreed to vacate the Ninth Circuit's holding that the petitioner had a "'a protected liberty interest in marriage that entitled [her] to review of the denial of [her] spouse's visa,' and that the Government's citation of § 1182(a)(3)(B) did not provide Din with the 'limited judicial review' to which she was entitled under the Due Process Clause."  135 S. Ct. at 2132 (quoting 718 F.3d 856, 860, 868 (9th Cir. 2013)).  But no opinion commanded a majority of Justices:  Justice Scalia authored a plurality decision in which the Chief Justice and Justice Thomas joined; Justice Kennedy authored a separate concurrence in which Justice Alito joined.   A review of these two decisions is important to frame this Court's assessment as to whether the petitioners here have articulated a viable constitutional claim so as to overcome the bar to review presented by the doctrine of consular non-reviewability.

A threshold question is whether Justice Kennedy's opinion articulates a narrower subset of the reasoning of the plurality, *i.e.*, that all five Justices had Justice Kennedy's reasoning as a common denominator, so to make Justice Kennedy's opinion controlling here under familiar interpretative principles.  The Government here so contends.  It notes that "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds," *Marks v. United States*, 430 U.S. 188, 193 (1977), and argues that Justice Kennedy's concurrence in *Din* thereby articulates that case's controlling rationale, *see* Gov't Br. at 8 n.5.[6]

---

[6] The Court of Appeals for the District of Columbia Circuit has helpfully explained how *Marks* is to apply in divided-majority situations.  *Marks*, it has stated,

> mean[s] that the narrowest opinion "must represent a common denominator of the Court's *reasoning;* it must embody a position implicitly approved by at least five Justices who support the judgment."  Stated differently, *Marks* applies when, for

This Court does not agree. The logic of Justice Kennedy's opinion was not a narrower subset of the *ratio decidendi* of the plurality. Rather, the Court reads Justice Scalia's plurality opinion and Justice Kennedy's concurring opinion as reaching the same result—vacating the Ninth Circuit's decision—but via distinct and non-overlapping due process inquiries.

Justice Scalia's plurality opinion held that no liberty interest was at stake, such that the Due Process Clause was not implicated. *See Din*, 135 S. Ct. at 2138 (plurality opinion). The concurring opinion, in contrast, assumed without deciding that a liberty interest was at stake. It concluded that the process afforded was adequate under the Due Process Clause. *See Din*, 135 S. Ct. at 2139 (Kennedy, *J.*, concurring in the judgment). The plurality, however, did not anywhere adopt the thesis of Justice Kennedy's opinion: that, if a liberty interest *were* at stake, the process afforded would be sufficient. The plurality simply did not reach that question. Indeed, Justice Scalia expressly stated that it was unnecessary to do so. *See Din*, 135 S. Ct. at 2132 (plurality opinion) ("The first question that we must ask, then, is whether the denial of Berashk's visa application deprived Din of any of these interests. Only if we answer in the affirmative must we proceed to consider whether the Government's explanation afforded sufficient process."). It is conceivable, therefore, that one or more Justices in the *Din* plurality would have held that, if the petitioners *had* a recognized liberty interest (*e.g.*, a parent's relationship with a minor child, *cf.*, *e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972)), the process afforded Din's husband in the denial of his visa application would have been insufficient under the Due Process Clause. The

---

example, "the concurrence posits a narrow test to which the plurality must *necessarily agree as a logical consequence* of its own, broader position."

*United States v. Epps*, 707 F.3d 337, 348 (D.C. Cir. 2013) (quoting *King v. Palmer,* 950 F.2d 771, 781 (D.C. Cir. 1991) (*en banc*))); *see United States v. Johnson*, 467 F.3d 56, 64 (1st Cir. 2006) (similar).

plurality's decision to resolve the case on a logically antecedent ground makes the answer to that question unknowable. *Din* therefore leaves undecided whether, assuming that a liberty interest is at stake, the process afforded in that case is sufficient to satisfy due process. *See Morfin v. Tillerson*, 851 F.3d 710, 713 (7th Cir.), *cert. denied*, 138 S. Ct. 380 (2017) (noting that, in *Din*, "the concurring opinion is not a logical subset of the lead opinion (or the reverse)"). *But see Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016) (treating Justice Kennedy's opinion as controlling).[7]

*Din* therefore does not reflect a rationale commanding a majority of Justices. "When it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court." *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003). In circumstances where no common rationale exists, "[t]he only binding aspect of such a splintered decision is its specific result," *id.*, and the "precedent is to be read only for its persuasive force," *Epps*, 707 F.3d at 349.

The Court therefore will address the key issue here—whether the doctrine of consular non-reviewability, or its exception, applies—from three perspectives: (1) the rationale of the *Din* plurality; (2) the rationale of the *Din* concurrence; and (3) the law as it existed pre-*Din*. *See United States v. Leonard*, 844 F.3d 102, 109 (2d Cir. 2016) (finding it unnecessary to locate the

_____

[7] In *Cardenas*, the Ninth Circuit reasoned that the *Din* plurality "would necessarily agree that, when the consular officer cites such a statute [*i.e.*, § 1182(a)(3)(B)], the denial stands, at least in a case only raising the due process rights of a citizen spouse." 826 F.3d at 1171. While that is surely true, it does not answer the question *Marks* instructs courts to ask: on what *reasoning* did a majority of the Court necessarily agree? *See, e.g.*, *Epps*, 707 F.3d at 348. This Court therefore respectfully disagrees with the Ninth Circuit's treatment of Justice Kennedy's plurality as controlling and agrees with the Seventh Circuit's contrary assessment. The Second Circuit has not yet addressed this issue.

narrowest grounds, under *Marks*, of a divided Supreme Court decision where, under the rationale

of either the plurality or concurrence, the result would be the same); *see also Lleshi*, 127 F. Supp.

3d at 200 (considering a "straightforward application of the consular non-reviewability doctrine"

as expressed in the Supreme Court's pre-*Din* decision in *Mandel* and the Second Circuit's

decision in *American Academy of Religion*, 573 F.3d at 123). As the Court now explains,

petitioner's claim fails under the *Din* concurrence and the pre-*Din* case law and, although the *Din*

plurality does not specifically foreclose it, gains no support from that opinion.

## 2. The *Din* Plurality

The *Din* plurality opinion does not assist petitioners. The plurality opinion held that a

U.S. citizen does not have a liberty interest, protected by the Due Process Clause, in living in the

United States with a spouse. *Din*, 135 S. Ct. at 2131 (plurality opinion) ("There is no such

constitutional right . . . to live in the United States with [one's] spouse."). And nothing in the

plurality opinion affords succor to petitioners here.

To be sure, the *Din* plurality opinion does not squarely dispose of petitioners' claims

either. That is because this case does not implicate the precise liberty interest which that opinion

found non-cognizable. Unlike the *Din* petitioner, petitioners here are the *children* (not the

spouse) of the visa-seeking alien.[8] And petitioners here do not cast their liberty interest in terms

of a specific relationship but in the preservation generally of family unity: They assert "that their

family unity . . . [can]not [be] denied by the government on account of national origin and/or

religious beliefs." Pet. Br. at 5. Because the *Din* plurality did not address whether the precise

relationship or the claimed liberty interest here is protected, let alone the process that would be

---

[8] The Government argues that a mother and her adult children lack a "constitutionally protected liberty interest in maintaining a parent-adult child relationship," Gov't Br. at 12, but does not point to any authority from the Second Circuit—or courts within—for that broad proposition.

due to a petitioner who asserted a protected interest, *see* 135 S. Ct. at 2132 (plurality opinion) (declining to address this issue), that opinion, even if it had been adopted by a majority, would not dispose of this case. Even if the liberty interest at issue here would be recognized by the *Din* plurality, nothing in that opinion would assist petitioners in establishing their claim that the process afforded them here was inadequate.

### 3. The *Din* Concurrence

The *Din* concurrence, in contrast, would squarely inter petitioners' constitutional claims. Justice Kennedy assumed for the purposes of his analysis that the liberty interest at issue there was protected by the Due Process Clause, as the Court likewise assumes here. Justice Kennedy's opinion held that "an executive officer's decision denying a visa that burdens a citizen's own constitutional rights is valid when it is made 'on the basis of a facially legitimate and bona fide reason.'" *Din*, 135 S. Ct. at 2140 (Kennedy, *J.*, concurring in the judgment) (quoting *Mandel*, 408 U.S. at 770). And, he wrote: "Once this standard is met, 'courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against' the constitutional interests of citizens the visa denial might implicate." *Id.* (quoting *Mandel*, 408 U.S. at 770).

Petitioners argue that, under that standard, they should prevail because the reason given for denying Saleh's visa—that she is inadmissible pursuant to § 212(A)(3)(B)—is not facially legitimate. *See* Pet. Br. at 3. That is so, they argue, because the record lacks facts "that give an indicia of credence to the Consular Officer's decision," ostensibly distinguishing this case from *Din. Id.*

Petitioners, however, misconceive Justice Kennedy's analysis. His opinion did not require the Government to demonstrate factual support for the reason stated for denying the visa application at issue. Rather, Justice Kennedy held, a consular officer's mere *citation* of the INA's anti-terror provision, 8 U.S.C. § 1182(a)(3)(B), "suffices to show that the denial rested on

12

a determination that Din's husband did not satisfy the statute's requirements." 135 S. Ct. at 2140; *see also id.* at 2139 ("[T]he Government satisfied due process when it notified Din's husband that his visa was denied under the immigration statute's terrorism bar, § 1182(a)(3)(B)."). Thus, while the Government must show that the denial was based on a facially legitimate reason, under Justice Kennedy's decision, nothing more than a citation to section 212(a)(3)(B) is necessary to so demonstrate. Citation to that provision, by itself, "indicates . . . a bona fide factual basis for denying a visa." *Id.* at 2140. As Justice Kennedy explained, "§ 1182(a)(3)(B) specifies discrete factual predicates the consular officer must find to exist before denying a visa." *Id.* at 2141. A reviewing court is not to probe whether a consular officer *actually* found such factual predicates; rather, "[a]bsent an affirmative showing of bad faith on the part of the consular officer," a mere citation to § 1182(a)(3)(B) is sufficient. *Id.*

Petitioners seek to distinguish *Din* on the ground that the petitioner there had conceded that her husband, the visa applicant, had previously worked in the Taliban government. *See id.* at 2140–41, cited at Pet. Br. at 3. But that fact was not necessary to Justice Kennedy's concurrence. On the contrary, Justice Kennedy noted that that fact would be "itself insufficient to support exclusion." 135 S. Ct. at 2141. As he made clear, it was not the visa applicant's association with the Taliban that decided the case, as inquiry into the degree of factual support for the consular decision, absent a plausible allegation of bad faith, was outside the scope of judicial review. *See id.*; *see also id.* at 2146 (Breyer, *J.*, dissenting). Because the Court does not find that the petition, as pled, makes out a plausible allegation of bad faith, *see* pp. 15–22, *infra,* it is therefore irrelevant that the record does not reflect a known connection to terrorism on the part of the applicant here, Saleh.

Here, the Refusal Worksheet reflects that, as in *Din*, the consular officer "notified [Saleh] that [her] visa was denied under the immigration statute's terrorism bar, § 1182(a)(3)(B). *Id.* at 2139 (Kennedy, *J.*, concurring in the judgment). Under Justice Kennedy's approach, the Government therefore "satisfied due process" so as make the limited exception to consular non-reviewability inapplicable.

### 4. The Law Pre-*Din*

Putting *Din* to one side, the Supreme Court's decision in *Mandel*, and the Second Circuit's cases applying it, control this Court analysis. This authority, too, dictates dismissal. Under this line of cases, as under Justice Kennedy's *Din* concurrence, the Court inquires whether the consular officer has provided a "facially legitimate and bona fide" reason for rejecting the applicant's visa. *Mandel*, 408 U.S. at 769, 770; *accord Din*, 135 S. Ct. at 2140 (Kennedy, *J.*, concurring in the judgment). If so, the Court's inquiry is at an end. *Mandel*, 408 U.S. at 770; *Am. Acad. of Religion*, 573 F.3d at 137 ("We conclude that we have to take literally the statement in *Mandel* that courts may not 'look behind' exclusion decisions, whether the decision is the Attorney General's exercise of discretion to waive inadmissibility or the consular officer's decision that a statutory ground of inadmissibility applies to the visa applicant, at least in the absence of a well supported allegation of bad faith, which would render the decision not bona fide."); *accord Din*, 135 S. Ct. at 2140 (Kennedy, *J.*, concurring in the judgment). As noted, that analysis here, as under Justice Kennedy's *Din* concurrence, ends the Court's inquiry, because the consular officer has provided a facially legitimate and bona fide reason for rejecting Saleh's visa. *Am. Acad. of Religion*, 573 F.3d at 137; *see Morfin*, 851 F.3d at 713 (noting that Justice Kennedy's concurrence "left things as *Mandel* had left them").

## C.   Petitioners' Allegations of Bad Faith are Insufficient

Following Justice Kennedy's *Din* concurrence, which suggested that an "affirmative showing of bad faith on the part of the consular officer" would justify a court's review of the consular official's reasoning, 135 S. Ct. at 2141, Saleh and the Alshaifs argue that the consular decision here was made in bad faith. They note (1) the lack of evidence tending to show that Saleh, a lifelong housewife, has a connection to terrorism, which, they contend, is itself "a sufficient demonstration of bad faith," Pet. Br. at 4; and (2) what they argue is evidence that the consular decision denying Saleh's visa was "in retaliation" for the filing of the initial petition in this case, *id.* Under the governing case law, however, neither of these considerations, viewed separately or together, is sufficient to show the consular officer's bad faith.

First, the lack of record evidence of the applicant's connection to terrorism cannot, by itself, support a claim of a bad faith. This Court must "take literally the statement in *Mandel* that courts may not 'look behind' exclusion decisions." *Am. Acad. of Religion*, 573 F.3d at 137. Because a court may not look behind an exclusion decision to examine the evidence supporting it, it follows that the *exception* to that principle cannot be based on the lack of known supporting evidence.

Petitioners' second argument, however, presents a more difficult question, as to which the Court has benefited from the parties' thoughtful supplementary submissions. A viable claim of retaliatory decision-making might well justify "look[ing] behind" an exclusion decision, *cf. Din*, 135 S. Ct. at 2141 (Kennedy, *J.*, concurring in the judgment). The Government concedes that a decision made "*solely* in retaliation for the filing of [Saleh's] mandamus petition" would provide a basis to look behind the consular officer's decision. Gov't Supp. Br. at 2. Accordingly, the Court assumes that well-pled allegations that a consular official's decision was

made in retaliation for the filing of a mandamus petition would provide a sufficient basis to look behind that decision.

Petitioners' claim of retaliation, however, is not pled with requisite specificity or plausibility to state a claim of bad faith. Petitioners' sole basis to claim retaliation is this: "Defendants' refusal of Plaintiff Ameera Abdu Saleh's visa application was a retaliatory act in response to her filing the instant case against them." Am. Pet. ¶ 32; *see* Pet. Br. at 4. But that allegation is conclusory—it "tenders [a] 'naked assertion' devoid of 'further factual enhancement,'" and thus "will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).

That said, the Court, on its review of the Amended Petition, noted factual allegations which—although not emphasized by petitioners—led the Court to commission supplemental briefing as to whether the allegations supported an inference of retaliation. The Court directed the parties to address, in particular: (1) whether the consular decision denying Saleh's visa application occurred sufficiently close in time to the filing of her initial petition to support a *prima facie* case of retaliation; (2) whether the fact that the consular decision was issued the day before the Government's deadline to respond to the initial petition in this case could support the inference that that decision had been motivated by Saleh's lawsuit, as opposed to the reason stated in the Refusal Worksheet, *see* Am. Pet. ¶ 27; Dkts. 16–17; (3) whether the fact that the U.S. Embassy in Djibouti had earlier indicated approval of Saleh's immigrant visa in November 2015, Am. Pet. ¶ 20, before denying it, *id.* ¶ 27, would support the inference that the denial was motivated by this lawsuit; and (4) whether Saleh's claimed non-association with terror organizations might support the inference that the consular denial of her visa application was based on a different, and illegitimate reason, Am. Pet. ¶¶ 30–31.

Although the matter is not entirely free from doubt, the Court is now persuaded that these factual allegations do not plausibly support the inference that the consular official acted in retaliation for Saleh's filing of a mandamus petition. At the outset, the Court notes that the familiar burden-shifting framework used in the Title VII context to analyze claims of retaliation, *see McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), is inapplicable here. In Title VII cases, a plaintiff must make out only a *prima facie* case of retaliation, in which case the "burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001). Such a plaintiff makes such a *prima facie* case by showing that "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). That burden-shifting framework eases a plaintiff's pleading burden, by allowing the plaintiff to rely on inferences of an impermissible motivation that arise from factors such as the proximity of an employee's protected activity and an employer's action.

The *McDonnell-Douglas* burden-shifting framework, however, ill fits the context here, given the Supreme Court's command that a petitioner challenging a consular decision must make an "affirmative showing of bad faith." *Din*, 135 S. Ct. at 2141 (Kennedy, *J.*, concurring in the judgment).[9] It is also inconsistent with the limited review available to those aggrieved by consular officials' decisions. Unlike decisions reviewable under Title VII, the decisions of

---

[9] This locution used by Justice Kennedy accords with the Second Circuit's formulation in *American Academy of Religion*, which requires a petitioner seeking to avoid the doctrine of consular non-reviewability to make a "a well supported allegation of bad faith, which would render the decision not bona fide." 573 F.3d at 137.

consular officials need only be "*facially* legitimate and bona fide." *Mandel*, 408 U.S. at 770.

Shifting the burden of production to the Government once a petitioner has made a *prima facie*

showing of retaliation is inconsistent with *Mandel*. It would compel the Government to adduce

evidence that its decision had a valid basis, whereas, under the case law, the Government has

already done so simply by noting the valid statutory basis which the consular official cited in

denying Saleh's visa. The Court therefore considers simply whether petitioners' allegations

plausibly plead retaliatory action, without regard to whether those allegations make out a *prima*

*facie* case of retaliation.

The Court considers, first, the factor of temporal proximity. As the Government

persuasively argues, in the context here, no inference of retaliation plausibly arises from the fact

that the consular decision denying Saleh's visa application came some four months after the

filing of her initial petition. The initial mandamus petition, after all, demanded action—that the

State Department act on Saleh's pending visa application. *See* Pet. ¶¶ 51–55. That the

Department thereupon acted does not signal retaliation. By the same measure, the proximity of

the consular official's denial (April 26, 2017) and the deadline (April 27, 2017) which the Court

had set for the Government's answer does not bespeak retaliation.

The Court next considers the allegation that Saleh's visa application, while never finally

approved, had allegedly been earmarked for approval prior to the filing of a mandamus petition.

That allegation, too, in context, does not support an inference of retaliation. By way of

background, a visa application follows a several-step path. *See generally* U.S. Dep't of State,

*The Immigrant Visa Process*, https://travel.state.gov/content/travel/en/us-visas/immigrate/the-

immigrant-visa-process.html. That process begins, as here, *see* Am. Pet. ¶ 14, with the filing, by

a U.S. citizen (or green-card holder), of an I-130 petition with the U.S. Customs and Immigration

Service (USCIS) seeking to have the citizen's alien relative classified as an immediate relative, 8 U.S.C. § 1154(a)(1)(A); *see id.* § 1151(b)(2)(A)(i) (defining immediate relatives). Once the USCIS so classifies the alien, the agency refers the alien to the National Visa Center, which handles the processing of the visa application. *See* U.S. Dep't of State, *After Your Petition is Approved*, https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/after-petition-approved.html; *see also* 8 U.S.C. §§ 1201(a)(1), 1202(a). After an applicant pays a fee, completes an application, and submits several other documents, an applicant is then eligible for an interview. *See* U.S. Dep't of State, *Interview*, https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/interview.html; *see also* 8 U.S.C. § 1202(b). As the State Department describes the process, the interview is the final step: "At the end of your immigrant visa interview at the U.S. Embassy or Consulate, the consular officer will inform you whether your visa application is approved or denied." U.S. Dep't of State, *After the Interview*, https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/interview/after-the-interview.html.

Petitioners allege that the U.S. Embassy in Djibouti in 2015 approved with finality Saleh's immigrant visa, Am. Pet. ¶ 20, only to deny it after she brought this action, *id.* ¶ 27. But the parties agree that, as of late 2015 and through 2016, prior to the filing of this suit, Saleh's application was listed as being in "administrative processing." Gov't Suppl. Br. at 4 (citing Am. Pet. ¶ 21). And a visa that is in "administrative processing" cannot be said to have received final

approval. *See Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry (Nine Iraqi Allies)*, 168 F. Supp. 3d 268, 284, 290–92 (D.D.C. 2016).[10]

To be sure, the November 2015 document Saleh alleges she received from the U.S. consular official in Djibouti, Brian Sells, is no model of clarity, and certainly signaled approval at the time. It states: "Your immigrant visa is approved. The Embassy will now prepare your visa and immigration packet. We cannot guarantee how long this will take." *See* Am. Pet ¶ 20; Pet. Supp. Br., Ex. B. But the undisputed fact that afterwards—yet before Saleh's lawsuit was filed—her application was placed in "administrative processing" undermines any claim of a final decision approving the visa. *Cf. Nine Iraqi Allies*, 168 F. Supp. 3d at 284 (reaching the same conclusion as to the procedures applicable to the Special Immigrant Visa programs). Indeed, petitioners ultimately concede that, before the April 26, 2017 denial of her visa application, "Ms. Saleh did not have a final decision on her visa." Pet. Supp. Br. at 4. Given this intervening development, the later denial of the application does not give rise to a meaningful inference of retaliatory intent.

In so concluding, the Court is constrained to note that the State Department's own regulations (and website) do not appear to contemplate a decisional route precisely like the one

---

[10] The Government contends the opposite—that "administrative processing" is tantamount to denial, such that Saleh's visa had already been denied as of December 28, 2016, when she filed suit. But the materials on which the Government relies do not establish this. Chloe Dybdahl, the Chief of the Advisory Opinions Division in the Department of State's Bureau of Consular Affairs' Office of Legal Affairs, attests in her sworn declaration, Dkt. 28 ("Dybdahl Decl.") that the State Department's Consular Consolidated Database reflects that visa applications from Saleh were denied by consular officials in Sana'a, Yemen in 2010, 2011, and 2012. *Id.* ¶¶ 4–5. She further attests that that database also shows that Saleh "appeared at the U.S. Embassy in Djibouti" on "November 18, 2015," *id.* ¶ 7, consistent with Saleh's petition, Am. Pet. ¶ 18 (alleging that Saleh visited the Djibouti embassy "on or about November 17, 2015"). She does not, however, state that Saleh's 2015 application had been denied as of December 28, 2016. *See id.* ¶ 7.

that Saleh's application appears to have followed prior to the filing of her lawsuit. The Department instructs that "[w]hen a visa application has been properly completed and executed before a consular officer in accordance with the provisions of INA and the implementing regulations, the consular officer must either issue or refuse the visa under INA 212(a) or INA 221(g) or other applicable law." 22 C.F.R. § 42.81. When an application requires further consideration via "administrative processing," it appears that the proper procedure is to *deny* the application pursuant to Section 221(g) of the INA. *See, e.g.*, *Elhabash v. U.S. Dep't of State*, No. CIV. 09-5847 (FSH), 2010 WL 1742116, at *1 (D.N.J. Apr. 27, 2010) (describing visa application following such a process); *Nine Iraqi Allies*, 168 F. Supp. 3d at 284 (recounting the Government's position that, pursuant to 22 C.F.R. § 42.81, a visa application must be either granted or denied following an interview, and that "any further processing of a visa application is best viewed as a 'reconsideration' of the application's denial").[11] These regulations do not appear to contemplate an act of approval by a consular official followed by further consideration via "administrative processing." Indeed, as one district court has noted, the "Government's characterization of the visa decision process conflicts with its own actual practices." *Nine Iraqi Allies*, 168 F. Supp. 3d at 284 (noting that the Department appears to—at least in some cases—

---

[11] The State Department's website describes "Administrative Processing" thus: "Some visa applications require further administrative processing, which takes additional time after the visa applicant's interview by a consular officer." U.S. Dep't of State, *Administrative Processing Information*, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/administrative-processing-information.html/. That description does seem to contemplate that a consular officer's interview will result in something other than a visa being approved or denied—that is, instead, an application being referred for further administrative processing.

treat "administrative processing" as a "pre-requisite to reaching" a decision on an immigrant visa).[12]

Any deviation by the State Department from its regulations in the processing of Saleh's application, however, would not give rise to an inference of retaliation, given that the agency's placement of her application in "administrative processing" predated her petition. And the exception that exists to the doctrine of consular non-reviewability is not for consular decisions "contrary to agency regulations," *Ngassam*, 590 F. Supp. 2d at 466–67, but decisions that, based on a petitioner's "affirmative showing," were reached in "bad faith," *Din*, 135 S. Ct. 2141 (Kennedy, *J.*, concurring). Saleh's factual allegations here do not plausibly so plead.

The Court, finally, considers petitioners' assertion that Saleh has no connection to terrorist organizations. That allegation does not support the assertion that her application was denied in retaliation for the filing of her mandamus petition. To make the requisite affirmative showing of bad faith decision-making, "[i]t is not enough to allege that the consular official's information was incorrect." *Bustamante v. Mukasey*, 531 F.3d 1059, 1062–63 (9th Cir. 2008). Instead, a petitioner must plausibly and with particularity allege "that the consular official did not in good faith believe the information he had." *Id.* at 1062. That petitioners have not done.[13]

---

[12] Petitioners' own submissions confirm that Saleh's application—far from having been approved—was under review during 2016. As the correspondence between Saleh's attorney, Julie Goldberg, and the U.S. consular official, Brian Sells, reflects, Ms. Saleh's application had not been fully processed by the State Department as late as August 27, 2016. *See* Pet. Supp. Br., Ex. A (email from Brian A. Sells to Julie Goldberg, August 27, 2016). For example, Saleh still required a medical exam before her visa could be approved. *See id.* (stating that Saleh "needs to do a new medical"); 22 C.F.R. § 42.66 ("Before the issuance of an immigrant visa, the consular officer shall require every alien, regardless of age, to undergo a medical examination in order to determine eligibility to receive a visa."); 8 U.S.C. § 1201(d) (same).

[13] Petitioners' reliance on *Macias v. Kerry*, No. 13CV0201-GPC-JMA, 2014 WL 654579 (S.D. Cal. Feb. 19, 2014) is misplaced. That decision, applying the Ninth Circuit's decision in *Din* (subsequently vacated by the Supreme Court), held that a consular official's mere citation to 8 U.S.C. § 1182(a)(2)(C), without the officer's assurance that she had had reason to believe the

treat "administrative processing" as a "pre-requisite to reaching" a decision on an immigrant visa).[12]

Any deviation by the State Department from its regulations in the processing of Saleh's application, however, would not give rise to an inference of retaliation, given that the agency's placement of her application in "administrative processing" predated her petition. And the exception that exists to the doctrine of consular non-reviewability is not for consular decisions "contrary to agency regulations," *Ngassam*, 590 F. Supp. 2d at 466–67, but decisions that, based on a petitioner's "affirmative showing," were reached in "bad faith," *Din*, 135 S. Ct. 2141 (Kennedy, *J.*, concurring). Saleh's factual allegations here do not plausibly so plead.

The Court, finally, considers petitioners' assertion that Saleh has no connection to terrorist organizations. That allegation does not support the assertion that her application was denied in retaliation for the filing of her mandamus petition. To make the requisite affirmative showing of bad faith decision-making, "[i]t is not enough to allege that the consular official's information was incorrect." *Bustamante v. Mukasey*, 531 F.3d 1059, 1062–63 (9th Cir. 2008). Instead, a petitioner must plausibly and with particularity allege "that the consular official did not in good faith believe the information he had." *Id.* at 1062. That petitioners have not done.[13]

---

[12] Petitioners' own submissions confirm that Saleh's application—far from having been approved—was under review during 2016. As the correspondence between Saleh's attorney, Julie Goldberg, and the U.S. consular official, Brian Sells, reflects, Ms. Saleh's application had not been fully processed by the State Department as late as August 27, 2016. *See* Pet. Supp. Br., Ex. A (email from Brian A. Sells to Julie Goldberg, August 27, 2016). For example, Saleh still required a medical exam before her visa could be approved. *See id.* (stating that Saleh "needs to do a new medical"); 22 C.F.R. § 42.66 ("Before the issuance of an immigrant visa, the consular officer shall require every alien, regardless of age, to undergo a medical examination in order to determine eligibility to receive a visa."); 8 U.S.C. § 1201(d) (same).

[13] Petitioners' reliance on *Macias v. Kerry*, No. 13CV0201-GPC-JMA, 2014 WL 654579 (S.D. Cal. Feb. 19, 2014) is misplaced. That decision, applying the Ninth Circuit's decision in *Din* (subsequently vacated by the Supreme Court), held that a consular official's mere citation to 8 U.S.C. § 1182(a)(2)(C), without the officer's assurance that she had had reason to believe the

## CONCLUSION

For the foregoing reasons, the Government's motion to dismiss is granted, without prejudice. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 26.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 26, 2018
New York, New York

---

applicant came within the category proscribed by that statute, was not facially legitimate. But the Ninth Circuit's rule, which *Macias* applied, was rejected by the Supreme Court in *Din*.